In re CARBONE'S DELI, INC., Debtor.

Carbone's Deli, Inc., Plaintiff,

v.

Summit Place Partners, Ltd., Defendant.

Bankruptcy No. 95–30101.

Adversary No. 97–3029.

United States Bankruptcy Court, D. Connecticut.

Sept. 28, 2000.

Timothy D. Miltenberger, Coan, Lewendon, Royston, Deming & Gulliver, New Haven, CT, for Debtor.

Glenn T. Terk, Wolcott Business Center, Wethersfield, CT, for One Summit Place Partners, Ltd.

Barbara H. Katz, New Haven, CT, Chapter 7 Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON COMPLAINT SEEKING AVOIDANCE OF ESCROW TRANSFER

ALBERT S. DABROWSKI, Bankruptcy Judge.

### FINDINGS OF FACT

1. On or about June 2, 1990, Ronald J. Winfield (hereafter, "Winfield") and Robert Carbone (hereafter, "Carbone") entered into a certain written lease agreement (hereafter, the "Lease") with BHL Associates, Ltd. (hereafter, "BHL"). The Lease provided for Winfield and Carbone, or "an entity to be formed by them" (hereafter, "Tenant"), to lease Unit 203 (hereafter, the "Leased Premises") of a certain parcel of improved commercial real prop-

erty situated in the Town of Branford, State of Connecticut, commonly known as One Summit Place (hereafter, the "Real Property"), for a term of five years commencing July 15, 1990, and terminating July 14, 1995 (hereafter, the "Initial Term").

2. On June 12, 1990, Winfield and Carbone incorporated Carbone's Deli, Inc. (hereafter variously referred to as "CDI", the "Debtor", and/or the "Debtor-in-possession") for the purpose of operating a delicatessen upon the Leased Premises.

3. Under Section 3.01 of the Lease, during the Initial Term "base" rent was payable monthly in advance "without set-off, deduction or demand" in the amount of one-twelfth ($\frac{1}{12}$) the following annual amounts: $17,604.00 for the first year; $18,660.24 for the second year; $19,779.85 for the third year; $20,966.65 for the fourth year; and $22,224.64 for the fifth year (hereafter, "Base Rent").

4. Under Section 3.03 of the Lease, during the Initial Term "additional" rent (hereafter, "Additional Rent") was payable for the "Tenant's Proportionate Share" of all "Tax Payments" and "Operating Expenses" as more particularly defined in that Section (hereafter, "T & O"). The "Tenant's Proportionate Share" is scheduled as 8.20% of such T & O. In a current calendar year the tenant is required to make monthly advance payments against Additional Rent due, to be calculated as one-twelfth ($\frac{1}{12}$) of the "Tenant's Proportionate Share" of "Tax Payments" and "Operating Expenses". Also, "[a]s soon as practical after the end of each calendar year" the landlord may prepare and deliver to the tenant "Notices of Additional Rent Due" for T & O. Within 30 days of the delivery of such Notices, the tenant is obligated to pay the landlord for the "amounts shown thereof as due". Presumably, the amount due at the end of each calendar year is the amount of annual Additional Rent due, if any, over and above the aggregate of the monthly installments of Additional Rent already paid during that year. The Lease requires the landlord to prepare statements of T & O for each calendar year and make those statements available to the tenant within 90 days of the end of the calendar year.

5. CDI made payments to BHL for all Base Rent due, and all Additional Rent claimed by BHL, through October 1993. All such payments of rent under the Lease were drawn on an account titled in the name of CDI.

6. Not later than November 1993, a Receiver was appointed for the Real Property, presumably in connection with a pending state court civil action wherein a secured creditor of BHL sought to foreclose its interest in the Real Property.

7. According to the undisputed testimony of Winfield, he was told by the Receiver that CDI need only pay rent in an amount it "thought was fair". This apparent rent concession was made by the Receiver after Winfield had discussed alleged overcharges of Additional Rent by BHL.

8. According to the undisputed testimony of Winfield, he was told by Robert Owens (hereafter, "Owens") and Richard Lee (hereafter, "Lee"), principals of the commercial real estate firm, "Owens, Renz & Lee" (hereafter, "ORL"), that in view of their experience with foreclosures and receiverships, the Lease "perhaps was going to be null and void due to the strict foreclosure", and that "if [CDI] didn't show [its] lease to . . . [the Receiver] . . . there was no way he could determine [the] amount due."

9. According to the undisputed testimony of Winfield, CDI made rent payments to the Receiver for the months of November 1993 through March 1994 in the

amount of $972 per month, *i.e.* "half of the base rent". According to Winfield, full Base Rent payments were not made to the Receiver because Winfield "thought it was unfair that BHL was overcharging us and holding our security deposit, and now that they weren't around anymore I didn't think it was fair that I had to make the full payment." No payments of Additional Rent were made to the Receiver because Winfield believed that the failure of the Receiver to "bill" CDI for Additional Rent relieved CDI of the obligation to pay Additional Rent.

10. No rent was paid to the Receiver for the months of April, May and June, 1994 (these arrearages, and those described in ¶ 9, *above*, are hereafter referred to collectively as the "Debt"). For all or a portion of that period it appears that rent was not paid because CDI considered itself close to relocating to a new location, and had been told by Owens that "since you are interested in moving over there, then you might as well not pay the Receiver anything."

11. In or about June 1994, an entity known as One Summit Place Partners, Ltd., a/k/a Summit Place Partners, Ltd. (hereafter, "SPP"), purchased the Real Property, presumably from Gateway Bank following foreclosure. SPP has repeatedly represented to this Court that it is the "successor" to BHL "as the lessor pursuant to the [L]ease". *See, e.g.,* "Request for Administrative Expenses" (Doc. I.D. No. 7), ¶ 3.

12. On or about November 30, 1994, in connection with a civil action commenced by SPP against Winfield and Carbone in the Connecticut Superior Court, Judicial District of New Haven (Docket No. CVNH 9409–6508) (hereafter, the "Collection Action"), CDI transferred the sum of $15,000.00 (hereafter, the "Fund") into escrow (hereafter, the "Escrow Transfer") with Attorney Barry Pinkus (hereafter, "Pinkus"), attorney for Winfield and Carbone. That transfer—made by check from CDI's bank account—was in settlement of SPP's request for a prejudgment attachment against Winfield and Carbone in the Collection Action.

13. Immediately prior to the Escrow Transfer CDI had approximately $65,000.00 in liabilities and approximately $45,000.00 in assets.

14. On January 23, 1995 (hereafter, the "Petition Date"), CDI commenced the present bankruptcy case through the filing of a voluntary Chapter 11 petition with this Court.

15. On January 22, 1997, CDI, as Debtor-in-possession, commenced the instant adversary proceeding through the filing of a Complaint seeking to avoid the Escrow Transfer as preferential pursuant to 11 U.S.C. § 547(b). The Complaint also seeks, pursuant to 11 U.S.C. § 544(a), the avoidance of any lien on the funds subject to the Escrow Transfer.

## CONCLUSIONS OF LAW

1. The United States District Court for the District of Connecticut has subject matter jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this "core proceeding" on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1).

2. At the time of the commencement and trial of this adversary proceeding CDI was a "debtor in possession" within the meaning of Section 1101(1). As such, pursuant to, and as limited by, Section 1107(a), CDI had the rights and powers of a trustee to commence the instant adversary proceeding.

3. On February 6, 1998, this case was converted from one under Chapter 11 to one under Chapter 7. Barbara H. Katz is the duly appointed and acting Trustee, and has inherited the rights and duties under the instant litigation.

4. Bankruptcy Code Section 547 establishes the elements of a preferential transfer, to wit:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (1995).

5. The Escrow Transfer was the "transfer of an interest of the debtor in property".

6. SPP is, and was at all relevant times, a "creditor" of the Debtor, CDI, within the meaning of Bankruptcy Code Sections 101(10) and 547(b)(1). SPP is the acknowledged "successor" to BHL—the original Landlord under the Lease—and CDI is the tenant "entity to be formed by" Winfield and Carbone, which the Lease explicitly contemplated. Thus, SPP has a "right to payment" of the Debt from CDI irrespective of any rights against Winfield and/or Carbone. Consistent with that "right to payment" SPP has filed unsecured proofs of claim (Claims No. 9 and 11) in this Court.

7. Although not *made to* SPP, the Escrow Transfer was "for the benefit of" SPP within the meaning of Section 547(b)(1).

8. The Debt was owed to SPP by CDI before the Escrow Transfer, and the Escrow Transfer was made "on account of" the Debt within the meaning of Section 547(b)(2).

9. At the time it made the Escrow Transfer, CDI was "insolvent" within the meaning of Section 547(b)(3).

10. The Escrow Transfer was made "on or within 90 days before" the Petition Date as required by Section 547(b)(4).

11. Although SPP never *actually* received the funds transferred to Pinkus, the Escrow Transfer *"enabled"* SPP to receive more than it would have if the Escrow Transfer had not been made and SPP received payment of and on the Debt in a Chapter 7 case within the meaning of Section 547(b)(5).

12. SPP asserts that Bankruptcy Code Section 550 shields it from judgment on the Complaint because it benefitted from the Escrow Transfer innocently and in good faith. Section 550 provides in relevant part as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of

the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) *The trustee may not recover under subsection (a)(2) of this section from—*

*(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or*

(2) any immediate or mediate good faith transferee of such transferee.

\* \* \* \*

11 U.S.C. § 550 (1995) (emphasis supplied). It is important to note, however, that Section 550 is not invoked or implicated in this proceeding since the Complaint does not specifically pray for *recovery* of the Fund from SPP. Thus, it is not necessary for this Court to consider whether SPP is a "transferee that ... [took] for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided ...." Yet even if that analysis were necessary, SPP's alleged "good faith" would not shield it from recovery since SPP, as an "entity for whose benefit such transfer was made", enjoys only the recovery defenses of an "initial transferee". The "good faith" defense is only available to an "immediate or mediate transferee *of* such initial transferee" (emphasis supplied).

13. The Escrow Transfer did not create a lien interest in favor of SPP. Thus, it is unnecessary for the Court to consider whether any lien interest of SPP may be avoided.

## CONCLUSION

For the foregoing reasons judgment shall enter in favor of the Plaintiff **AVOIDING** the Escrow Transfer as against the Defendant pursuant to 11 U.S.C. § 547(b).